IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

| | | |
|---|---|---|
| RENEE L. McCRAY | : | |
| Plaintiff | : | |
| v. | : | Case 1:13-cv-01518 -ADC |
| SAMUEL I WHITE P.C.  et al | : | |
| Defendants | : | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Comes now the Defendants, Samuel I. White, PC (the "White Law Firm"), and John E. Driscoll, III, Robert E. Frazier, Jana M. Gantt, Laura D. Harris, Kimberly Lane, and Deena Reynolds (SIWPC and the individuals as "Substitute Trustees")(collectively hereinafter referred to as "the SIWPC Defendants), by and through undersigned counsel and submits their Memorandum in Support of their Rule 56  Motion for Summary Judgment and states as follows:

## A. INTRODUCTION

The scope of this case was significantly narrowed as a result of the Court's prior rulings in this case, including the Fourth Circuit Court of Appeals ruling in McCray v Federal Home Loan Mortgage Corporation et al No. GLR-13-1518, 2014 WL 293535 (D.Md. Jan. 24, 2014), aff'd in part, rev'd in part and remanded, 839 F.3d 354 (4th Cir. 2016) and the eventual dismissal from the action of the codefendants Wells Fargo Bank NA and Federal Home Loan Mortgage Corporation ("Freddie Mac"). The only remaining claims involve alleged violations of the FDCPA by the Substitute Trustees and their law firm the White Law Firm.

This is the third action the Plaintiff, Renee L. McCray ("McCray") has filed in this Court. In the present action McCray asserts claims against the SIWPC Defendants. The SIWPC Defendants are entitled to summary judgment because there is no genuine dispute as to any material fact, and it is entitled to judgment as a matter of law with respect to these two remaining

claims in the case. Though McCray alleged in previous actions that Defendants violated the Fair Debt Collection Practices Act ("FDCPA") in attempting to foreclose on the Property, she asserts that this action arises not only out of the original action filed, but also out of "new and continuous violations of the FDCPA." (4th Compl. ¶¶ 21, 45). McCray maintains that SIWPC Defendants initiated the foreclosure (Id. ¶ 21) and then "continue to foreclose on the Property without providing verified evidence that they have a legal right to do so." (Id. ¶ 45). Specially, in McCray's two-count Fourth Amended Complaint she alleges the SIWPC Defendants falsely represented the character, amount, or legal status of the Plaintiff's debt, falsely represented that the secured party's were entitled to enforce the default without verifying the debt and the authority the SIWPC Defendants possessed such that their actions are tantamount to a violation of 15 USC §§1692e((2)(A) (Id. ¶¶  82), 1692e((2)(B), 1692i (Id. ¶¶ 26, 30). Additionally, McCray alleges that the Defendants use false representations and deceptive means in an attempt to collect Plaintiff's debt in violation of §1692e(2) (Id. ¶¶ 27, 82), by failing to verify the debt after her demand  in 2012 in violation of §1692g(b)(Id. ¶¶ 25, 84, 85). McCray then alleges in Count II, that the Defendants continued to so act after the verification was sought, in 2016 by filing and pursuing the foreclosure action in contradiction of §1692i; failing to obtain her prior consent to contact her in violation of §1692c(a); that the foreclosure caused her embarrassment and humiliation which damaged her reputation in violation of §1692d(1(Id. ¶ 28)); that advertising the foreclosure sale on the Auctioneers site and in the Daily Record  without McCray's authorization violated §1692c(b); and as to proceed with the illegal debt collection "dubbed a non-judicial foreclosure" was a  violation of §§1692f(6) (Id. ¶ 28), 1692f(8) (Id. ¶¶ 83), 1692e(5) (Id. ¶¶  29, 35), 1692f(6)(A) and (C) (Id. ¶ 29)  . McCray's Complaint further alleged that the Substitution of Trustee instrument which was recorded violated 15 USC §§1692j(a) (Id. ¶¶  32) and 1692j(b) (Id. ¶¶ 32) and 1692c(b) (Id. ¶¶  37, 80, 81).

Despite the validation of the right to foreclosure determination by both State and Federal Courts, McCray still contends, based upon her purported forensic examination of the loan, that Wells Fargo lacked the authority to appoint the Substitute Trustees, thus the Substitute Trustees were unlawfully foreclosing on her property, lacked documentation of Wells Fargo's authority, and failed to investigate Wells Fargo's authority such that the SIWPC Defendants were defrauding McCray of her property.

As discussed below, McCray misconstrues the verification process and fails to establish

that the debt was not in fact verified. Moreover, even if the debt dispute was not been verified by the SIWPC Defendants in late 2012, the prior validations provided by Wells Fargo in 2011 and early 2012 coupled with the Notice of Intent to Foreclose ("NOI") prior to the docketing of the foreclosure, are tantamount to verification of the debt. Moreover, notwithstanding the verification of the debt as described above the alleged lack thereof, was harmless and immaterial and did not result in any damage to her.

## PROCEDURAL HISTORY OF THE CASE

The matter arises out of a default of a refinance loan to McCray which was secured by a deed of trust encumbering the real property commonly known as 109 N. Edgewood Street, Baltimore MD 21229 (the "Property"). McCray refinanced on October 7, 2005 the deed of trust previously recorded at Liber 4414 folio 212 paying off the prior loan of $46,373.01[1]. The original beneficiary of the deed of trust was American Home Mortgage, who then transferred the loan to Freddie Mac, who in turn retained Wells Fargo Bank NA ("Wells Fargo") to service the loan.

After making payments to Wells Fargo for some six (6) years on the loan, in 2011 McCray began making demands for loan information from Wells Fargo concerning the amounts due, the names of the secured party, and when the loan was acquired, which Wells Fargo responded to on several occasions.

McCray's payment default occurred on May 2, 2012.[2] When McCray failed to cure same, a breach notice was sent to McCray by Wells Fargo and the loan was accelerated. The loan was subsequently referred to the White Law Firm to undertake foreclosure proceedings. In anticipation of filing a foreclosure action, a fair debt letter dated September 28, 2012 and the Notice of Intent to Foreclose ("NOI"), dated on October 2, 2012, was sent to McCray.

McCray then re-initiated the same written dialogue she previously had with Wells Fargo re-demanding verification of the debt on October 6, 2012. McCray, contrary to the allegations of the SIWPC Defendants, maintain that she did not receive a response to her debt dispute, much

---

[1] McCray's prior loan payoff was $46, 373.01 with a new loan of $66,500.00 thereby taking equity out in the amount of $20,126.99 . See Refinance Affidavit on Deed of Trust Exhibit 1 p.16
[2] McCray had been current in her payment for some seven (7) years prior to defaulting. The default does not appear to be disputed.

like she had previously done with Wells Fargo, she made repeated demands suggesting that she had not gotten the appropriate response she demanded. Once again, the Defendants maintain that they did respond.

## 1.THE STATE LITIGATION

The foreclosure action which was originally filed by the Substitute Trustees on February 12, 2013 in the Circuit Court for Baltimore City, Maryland.  John E. Driscoll III et al Substitute Trustees v Renee L. McCray Civil Action No 24-O-13000-528  (the "State Foreclosure Action"). See Exhibit 2 State Foreclosure Action  Summary of Proceedings and Docket Entries[3].

It is undisputed that McCray is in default under her payment obligations and she did not dispute the allegations set forth in the NOI sent to her forty-five (45) days before the foreclosure action was docketed.

After the Order to Docket was served on McCray on February 28 2013, McCray began an extensive course of litigation and filed repeated bankruptcy actions and appeals, all of which were either denied or dismissed. Each motion asserted the very same arguments McCray advanced in her Fourth Amended Complaint filed in this action.  In this regard, McCray filed four (4) Motions to Dismiss, several Objections to Court Rulings, four (4) appeals to the Maryland Court of Special Appeals, two of which were dismissed by her,  , several Motions for injunctive relief, a motion for summary judgment, a removal to federal court and several bankruptcy matters, all of which are more fully delineated in the Summary of State Proceedings attached as Exhibit 2.

Despite all of McCray's actions, the foreclosure sale was duly noticed and finally occurred on November 15, 2017. The successful purchaser was Freddie Mac. Thereafter, McCray filed several post sale motions, all were summarily denied by the Circuit Court.

As to McCray's third appeal, on March 30, 2018 McCray sought injunctive relief once again pending her appeal. The Substitute Trustees filed a motion to dismiss the appeal as being an impressible interlocutory appeal, which the Maryland Court of Special Appeals ("COSA") granted.

In McCray's most recent COSA appeal, on October 3, 2018 COSA in an unreported *per*

---

[3] Exhibit 2 has an extraction of the Court Docket delineated as a Summary for the benefit of the Court. For judicial economy they are made as an exhibit.

*curiam* Opinion,  Case No 1463 September Term 2017  affirmed the Circuit Courts denial of McCray's multiple Motions to Stay or Dismiss she had previously filed. (Exhibit 3 COSA Opinion). McCray's petition for writ of certiorari to the Maryland Court of Appeals challenging the COSA opinion was denied on December 14, 2018.

## 2.THE FEDERAL LITIGATION

After the foreclosure action was initiated, McCray, on May 21, 2013  filed the instant Federal Court action claiming numerous violations under the Federal Debt Collection Practices Act ("FDCPA") and other statutory violations against the SIWPC Defendants, Wells Fargo and Freddie Mac (McCray I).

McCray I  am the first of three actions McCray filed in this Court.   McCray filed ) GLR-16-934 (McCray II)  in which  Judge Russell, in a  written opinion dismissed all similar claims except the FDCPA verification claim which was consolidated with McCray I (See Exhibit 6, ECF 97). McCray on June 2, 2016 also filed Driscoll v. McCray, No. GLR-16-1791(McCray III) in which she unsuccessfully sought to remove the state  court  foreclosure action to this Court On March 20, 2017, the Court remanded McCray III back to Baltimore City Circuit Court  for lack of subject matter jurisdiction ECF No. 77)

McCray filed the initial *pro se* Complaint (ECF 1) against Freddie Mac, Wells Fargo, as well as the White Law Firm, and attorneys employed by the firm, who are the substitute trustees in the foreclosure of a residential property securing McCray's mortgage loan.[4] On June 13, 2013, McCray filed a five count Amended Complaint (ECF 6). The First Amended Complaint asserted violations of various federal and Maryland consumer protection statutes.

Wells Fargo, Freddie Mac, and the SIWPC Defendants filed Motions to Dismiss as to all the claims in the First Amended Complaint on July 1, 2013 (ECF 8 and ECF 13). While the motions to dismiss were pending, McCray filed a Motion for Leave to File Second Amended Complaint (ECF 35). The most significant change McCray made in the Second Amended Complaint was withdrawing the two state law claims and "adding" Wells Fargo Home Mortgage,

---

[4] The foreclosure matter (the "Foreclosure Action") is pending in the Circuit Court for    Baltimore    City, Maryland, Case No. 24013000528. The Substitute Trustees were named as defendants in this lawsuit and alleged to be attorneys at the law firm of Samuel I. White, P.C. Amended Complaint, and ¶¶6 (d) through 6(i) .The Foreclosure Action was stayed in October of 2013 as a result of McCray filing bankruptcy. The Chapter 7 proceeding was concluded and a notice of termination of the bankruptcy stay was filed on September 8, 2014.

which is a division of Wells Fargo.[5]

In an apparent attempt to stave off the State Foreclosure Action, McCray filed, on September 23, 2013, a Chapter 13 Bankruptcy Action, Case No. 13-26131, in the United States Bankruptcy Court for the District of Maryland.  This case was  subsequently converted to Chapter 7 liquidation and McCray was discharged of her personal obligation of this debt on July 14, 2014 when the bankruptcy court issued the discharge order . The lien still remained secured against the Property.

Prior to her discharge, the United States Bankruptcy Court on May 21, 2014 entered an Ordered lifting the  automatic stay and entitling  Wells Fargo to proceed with the foreclosure action. See Exhibit 4 Court Order granting relief from the automatic stay.

On January 24, 2014, this Court issued an Order (ECF 44) and Memorandum Opinion (ECF 43) dismissing Freddie Mac, Wells Fargo and the SIWPC Defendants from McCray's FDCPA claim and dismissed the TILA claim altogether. The Court further dismissed McCray's RESPA claim to the extent that McCray was asserting that a "Notice of Default" dated September 14, 2011 constituted a Qualified Written Request under RESPA and to the extent that McCray was seeking damages for emotional distress (being the same as those sought  under her FDCPA claim violations)  for the alleged RESPA violations.

McCray subsequently filed a Motion to Alter or Amend Judgment or Alternatively for Relief from Judgment on February 5, 2014 (ECF 46) and further filed a notice of an interlocutory appeal on February 21, 2014 (ECF 51). On March 27, 2014 the District Court issued a Letter Order denying McCray's Motion to Alter or Amend Judgment or Alternatively for Relief from Judgment  (ECF 59). In the March 27, 2014 Letter Order the District Court also responded to McCray's question concerning the damages she is entitled to under RESPA, as follows:

> As previously noted in its Order, the statutory damages RESPA provides are "any actual damages" that occur "as a result of the failure" of Wells Fargo to respond to her qualified written requests as required. 12 U.S.C. §2605 (f)(1)(A) (2012). For example, McCray may recover any demonstrable out of pocket expenses she incurred for correspondence and travel. See Tsakaniskas v. JP Morgan Chase Bank N.A., No. 2:11-CV-888, 2012 WL 6042836 at *2 (S.D. Ohio Dec. 4, 2012); Rawlings v. Dovenmuehle Mortg.,

---

[5] As the Court correctly noted in its Memorandum Opinion filed January 24, 2014 (ECF 43), Wells Fargo Home Mortgage is not a separately incorporated entity and thus is not a new party. Thus, McCray's changes In her Second Amended Complaint did not materially affect the motions to dismiss.

Inc., 64 F. Supp2d 1156, 1164 (M.D. Ala. 1999). She had not demonstrated that any other damages apply.

As the White Law Firm had been dismissed from the action, Freddie Mac and Wells Fargo filed their Answers to Count III of the Second Amended Complaint. (ECF 62). On June 30, 2014 the United States Court of Appeals for the Fourth Circuit dismissed McCray's interlocutory appeal. (See ECF 63). A scheduling order was entered on July 10, 2014 (ECF 66-1) providing that depositions and discovery shall be completed by December 15, 2014 and all motions for summary judgment shall be filed on or before January 13, 2015.

Thereafter, Wells Fargo and Freddie Mac filed their Motion for Summary Judgment and the District Court subsequently granted same.

McCray, once again, noted her appeal to the Fourth Circuit (ECF 82). In that decision (ECF 86)[6], the Court affirmed the dismissal against Wells Fargo and Freddie Mac finding that Wells Fargo as servicer was vested with a beneficial interest as servicer to perform the foreclosure and with respect to Freddie Mac finding that McCray failed to "allege any sale, transfer, or assignment of her loan to Freddie Mac after Congress amended TILA to require notice." The Court concluded alternatively that because Wells Fargo informed McCray by a letter dated October 25, 2011, that Freddie Mac was the "investor" on the loan, McCray had notice of her claim as of that time and was therefore barred by the statute's one-year limitations period, see 15 U.S.C. § 1640(e), since she did not file the claim until May 2013.

As to the SIWPC Defendants, the Court reversed the dismissal of the FDCPA claim holding simply that McCray's complaint adequately alleged that the White Law Firm and the Substitute Trustees were deemed "debt collectors" and that their actions in pursuing foreclosure constituted a step in collecting debt and thus debt collection activity that is regulated by the FDCPA[7]. The Court held that McCray plead sufficient facts to survive the Motion to Dismiss. The Court did note that the issue of materiality, the District Court did not reach this argument despite being argued by the SIWPC Defendants, and the Court declined to address it on appeal.

In December 2015, the Bankruptcy Court issued a final decree and closed McCray's

---

[6] McCray v Federal Home Loan Mortgage Corporation et al No. GLR-13-1518, 2014 WL 293535 (D.Md. Jan. 24, 2014), aff'd in part, rev'd in part and remanded, 839 F.3d 354 (4th Cir. 2016)
[7] The Court previously held that in non-judicial foreclosures the firm and the Substitute Trustees were not deemed to be acting as debt collectors as they were not collecting any debt by proceeding in a foreclosure action. This very issue in now under consideration in the United States Supreme Court in an unrelated case of *Obduskey v. McCarthy & Holthus LLP, et al.*, 2018 Term. The oral argument was on January 7, 2019.

bankruptcy case. (Id. ¶ 67).   On January 11, 2016, SIWPC Defendants filed, in McCray's state foreclosure case, a "Notice of Termination of Automatic Stay of 11 U.S.C. Section 362." (Id. ¶ 56). SIWPC Defendants attached the final decree from McCray's bankruptcy case and asserted that they intended to resume foreclosure proceedings. (Id.). McCray received SIWPC Defendants' January 11 notice on January 13, 2016. (Id. ¶ 57). That same day, McCray sent SIWPC Defendants a "Notice to Debt Collector" in which she afforded SIWPC Defendants ten days to (1) "provide verified evidence that they had a right to continue the foreclosure action after the bankruptcy discharge," (Id. ¶ 58); (2) rebut her notice "line by line," (id.); (3) "cease and desist any and all foreclosure actions that have not been rendered by a judgment issued through a court of record," (Id. ¶ 59); and (4) provide a verified proof of claim that indicates that you are the  holder in due course. SIWPC Defendants failed to respond to McCray's January 13, 2016 notice. (Id. ¶ 57). On February 25, 2016, McCray received from SIWPC Defendants a notice dated February 22, 2016 that her home would be sold in a foreclosure sale. (Id. ¶ 83). The notice provided the following: "Pursuant to Maryland Rule 14-210 and pursuant to Section 7-105.2 of the Real Property Article of the Maryland Code, we are hereby notifying you that the foreclosure sale of [the Property] has been scheduled.".

　　In the notice of sale, Defendants attached a copy of the newspaper advertisement that they intended to run setting  forth the time, place, and terms of the foreclosure sale (the "Advertisement").. The Advertisement states that "the holder of the indebtedness secured by this Deed of Trust [has] appointed [Defendants]" to carry out the foreclosure sale. McCray alleges in both counts,  that SIWPC Defendants ran the Advertisement in The Daily Record on March 4, 11, and 18, 2016 in the "Public Notice" section. (Id. ¶ 73). She further alleges that between March 4 and March 21, 2016, SIWPC Defendants advertised the foreclosure sale of the Property on the website of Harvey West Auctioneers, LLC. (Id. ¶ 72). On March 2, 2016, McCray sent SIWPC Defendants a "Demand Notice to Cease and Desist Foreclosure Sale." (Id. ¶ 69). In addition to ceasing and desisting from selling her home, McCray's notice contained two demands. First, Defendants must "provide within 72 hours verification of the debt they were collecting, since the alleged debt was discharged on July 14, 2014 in [the Bankruptcy Court]." (Id. ¶ 67). Second, Defendants must "provide within 72 hours, verification that [the] SIWPC Defendants had an enforceable security interest to take any non-judicial action to effect dispossession or disablement of [the Property]." (Id. ¶ 68). When  SIWPC Defendants did not

respond to McCray's March 2, 2016 notice, on March 14, 2016, she sent them a "Notice of Fault and Opportunity to Cure – Demand Notice to Cease and Desist and Violations of the [FDCPA]." (Id. ¶ 69).

McCray again requested that Defendants validate the debt. (Id. ¶ 68). When Defendants failed to respond, on March 21, 2016, McCray sent them a "Notice of Default in Dishonor and Consent to Judgment and Notice of Pending Lawsuit to Enforce Violations of the [FDCPA]." (Id. ¶ 70).

McCray further alleges that in the February 2013 foreclosure action , Defendants filed "an illegal substitution of trustee document" in (Id. ¶ 33) but does not, however, elaborate on why the substitution was illegal.  Once again  this Court and others have held same to be proper. See U.S. Bankruptcy Court Memorandum Findings  Exhibit 4.

This Court, in its March 31, 2017 well reasoned Order  (ECF 97) disposed of , the McCray II case [8], in which McCray asserted the very same factual contentions and damages,  as alleged in the  4th Amended Complaint in this case  by  granting  partial summary judgment to the SIWPC Defendants  as to McCray's claims under 15 U.S.C. §§ 1692c(a), c(b), c(c), e(2)(A), f(6)(A), and j(a), but denied the motions as to McCray's claim under 15 U.S.C. § 1692g(b) without prejudice. See Opinion, Exhibit 6 ECF 97. These findings are tantamount to res judicata as to McCray's claims in the instant case as to the matter adjudicated therein

As discovery is complete, the instant Motion for Summary Judgment is filed.

## C. STANADRD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant

---

[8] **McCray I**. McCray v. Fed. Home Loan Mortg. Corp., No. GLR-13- 1518. **McCray II** GLR-16-934,  **McCray III** Driscoll v. McCray, No. GLR-16-1791(D.Md. removed June 2, 2016). On March 20, 2017, the Court remanded that case for lack of subject matter jurisdiction ECF No. 77

submission of the matter to a jury for resolution at trial. *Id*. at 249, 106 S.Ct. 2505.

In undertaking this inquiry, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). However, the Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. The Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md.2001) (citations omitted).

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party "cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Deans v. CSX Transp., Inc*., 152 F.3d 326, 331 (4th Cir.1998) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985) (internal quotations omitted)).

## D. DISCUSSION

This is a case where there is no real dispute about the substance or verbiage in the documents as nothing was false misleading or misrepresented as the right to foreclose has been fully adjudicated. Instead it is asserting whether  there was a verification of the debt and whether the secured party could act as it did. As to the latter, various courts of competent jurisdiction

have validated the issue of the right to foreclose so those issues are estopped from being claimed or moot See Opinions at Exhibit 3 (COSA), Exhibit 4 (USBC), and this Court Exhibit 6. Thus, the sole remaining issue concerns the verification of the debt  issue.

The FDCPA protects consumers from abusive and deceptive debt collection practices by debt collectors. *Spencer v. Hendersen–Webb, Inc*., 81 F.Supp.2d 582, 590 (D.Md.1999) (citing *United States v. Nat'l Fin. Servs., Inc*., 98 F.3d 131, 135 (4th Cir.1996)). The FDCPA covers debt collectors who "regularly collec[t] or attemp[t] to collect, directly or indirectly, [consumer] debts owed or due or asserted to be owed or due another." *Heintz v. Jenkins*, 514 U.S. 291, 294, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995) (quoting 15 U.S.C. § 1692a(6)).

In the context of the FDCPA, the verbiage of debt collection letters must be analyzed from the perspective of the "least sophisticated debtor." *Nat'l Fin. Servs., Inc*., 98 F.3d at 135–36. Although this standard aims to protect gullible consumers, it also "prevents liability for bizarre or idiosyncratic interpretations of the collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." Id. at 136 (citation omitted). §1692g (a) (4) allows a debtor to obtain a copy of a debt verification; and § 1692g (a) (5) allows a debtor to obtain the name and address of the original creditor. See 15 U.S.C. § 1692g (a) (4, 5). The FDCPA requires debt collectors to effectively convey these legal rights to debtors. *Miller*, 943 F.2d at 484. To be effective, "the notice must not be overshadowed or contradicted by other messages or notices appearing in the initial communication from the collection agency." Id. (quoting *Swanson v, Southern Oregon Credit Service, Inc*. 869 F.2d 1222, 1225 (1988) (internal quotation marks omitted).

As previously noted this action is really about whether the debt had been sufficiently verified by the SIWPC Defendants as all other claims made arise due to the alleged lack thereof. While McCray continually raises issues concerning the authority of (or the lack thereof of Freddie Mac) having an interest in the loan or the validity and enforceability of the note, or the Substitute trustees rights to act, these matters are irrelevant to the case. Wells Fargo and Freddie Mac 'right to foreclose' has been copiously adjudicated by the United States Bankruptcy Court in McCray's Chapter 7 bankruptcy action (see Exhibit 4), by this Court, by the Maryland Circuit Court, by the Maryland Court of Special Appeals in its recent decision(Exhibit 3), and in the Fourth Circuit in the prior appeal arising out of the bankruptcy, such that those issues are precluded from further consideration by either *res judicata*, or under the doctrine of law of the

case.

McCray presents no competent evidence to support any statutory violation of FDCPA arising from that alleged lack of verification.  Even if there was, as discussed below, any statutory violation said violation was immaterial or a result of a bona fide error. Furthermore, McCray has testified in both of her depositions, that she has not sustained any damages as a result of the alleged verification issues and her damages arise, if any there are,  from the separate *in rem* state foreclosure action pending in the Maryland Circuit Court; i.e., the "State Foreclosure Action".

It is apparent that what McCray seeks to do is to intertwine this action with her foreclosure action in hopes of creating a question of fact, but when the issues are viewed objectively and independently, the facts clearly indicate that there is no dispute of any genuine material issues and the Defendants are entitled to judgment as a matter of law.

## 1.THE VERIFICATION

Section 1692g of the FDCPA governs validation of debts. Subsection (b) provides that all debt collection activities shall cease when the borrower disputes the debt and requests validation. In foreclosure cases, there are three elements of a claim under subsection (b): (1) the plaintiff sent the defendant a request for debt validation; (2) the defendant did not respond; and (3) the defendant nevertheless continued debt collection actions by going through the foreclosure process. See *Blick v. Shapiro & Brown, LLP*, No. 3:16-CV-00070, 2016 WL 7046842, at *9 (W.D.Va. Dec. 2, 2016) (concluding plaintiff adequately pled claim for violation of 15 U.S.C. § 1692g when plaintiff alleged he wrote letter to defendant requesting validation of debt, but defendant did not to respond and continued debt collection actions by going through foreclosure process).

First McCray asserts that despite sending only a single debt dispute to the White Law Firm (4th Amended Compl ¶11, ECF 102. 105), that the firm and all the named substitute trustees in their individual capacity are liable. But McCray presents no credible evidence that the individual Defendants communicated with her under any circumstances in their capacity as substitute trustee. Merely because they are named substitute trustees McCray asserts that that makes them responsible parties. Clearly this is a misinterpretation of the law as to the verification which was sent by the firm. See the December 3, 2012 verification letter, Exhibit 5.

Accordingly, the 15 U.S.C. § 1692g claims as to the individually named substitute trustees must be dismissed.

McCray further claims that her demand for verification of the debt to the firm (Id. ¶ 12) was not responded to despite repeated demands for same even after she received the Fair Debt Letter of October 6, 2012 and the NOI. (Id. ¶¶12,15). The Defendants contend that it was responded to on December 3, 2012, by <u>both</u> certified and first class mail (ECF 110, See letter Exhibit 5), though only mailing  by regular first class mail is required[9]). In response,  McCray argues that because the USPS's letter of July 8, 2013 which says that the USPS had "no information available" at the time they responded of any '<u>certified</u> mailing' with a tracking number designated for the Defendants' December 3, 2012 FDCPA response, she erroneously concludes that no verification was mailed. See <u>McCray v Samuel I White PC.</u> GLR-16-934 ECF No. 11-5. (discussed in Exhibit 6 by this Court). McCray fails to point out that her inquiry to the postal service was untimely it being 8 months after the letter was mailed, and she presents no other evidence to contradict that the verification was sent by first class mail.

Moreover  one must question whether the verification was even necessary under the circumstances, as the very information had been repeatedly provided by Wells Fargo prior to her sending her dispute (See Exhibits 11 thru 22 discussed below). Accordingly, McCray's debt dispute, in this context,  was not actually a debt dispute, but merely a tactic sought to delay the proceedings, as 15 U.S.C. § 1692g provides the right to have creditor cease collection efforts until verification of the debt is obtained. Some delay was accomplished as the debt dispute verification from the White Law Firm was dated December 3 2012, and the foreclosure was not docketed until February 2013. Also even if the Defendants verification was not provided, as alleged and  as discussed below, the alleged failure to provide same was immaterial, and was a bona fide harmless error  since the very information sought had been provided to McCray by Wells Fargo and in the NOI. Regardless, McCray failed to sustain any damages arising therefrom.

Section 1692(g) of the FDCPA provides that, if a consumer notifies a debt collector within 30 days of receipt of an initial communication regarding collection of a debt that the debt is disputed, the debt collector must "cease collection of the debt" until it "obtains verification of

---

[9] 15 U.S.C. § 1692g(a)(4)  provides in part…. "the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment **will be mailed** to the consumer by the debt collector…." (emphasis added)

the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector." 15 U.S.C. §§ 1692g (a)(1)-(4)and (b). No provision of the FDCPA has been found which would require a debt collector to independently investigate the merit of the debt, or to investigate the accounting principles of the creditor, or to keep detailed files of any documents. *Chaudhry v. Gallerizzo*, 174 F.3d 394 (4th Cir. 1999).

The Courts have held, contrary to McCray's argument, that verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed. *See Azar v. Hayter,* 874 F.Supp. 1314, 1317 (N.D.Fla.), *aff'd,* 66 F.3d 342 (11th Cir.1995), *cert. denied,* 516 U.S. 1048, 116 S.Ct. 712, 133 L.Ed.2d 666 (1996). Consistent with the legislative history, verification is only intended to "eliminate the ... problem of debt collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S.Rep. No. 95–382, at 4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699. There is no concomitant obligation to forward copies of bills or other detailed evidence of the debt. Id. Chaudhry v. Gallerizzo, 174 F.3d 394, 406, (4th Cir. 1999). McCray contends that the verification requires presenting her with documentary proof under oath, (4th Amended Compl. ¶ 60) which verifies that she owes the debt and that all the verifications she has received are invalid as they are not sworn.

> Q; Okay, Now can you tell me what your definition of "validation of the debt " is?
> A: Well since I don't have a definition that you have in your possession, its sworn testimony. That is the validation and verification –you have it in all of my documents that I sent back to you. Also you have it in the interrogatories that were received.
> Q: Right. So it's your contention that verification has to be sworn?
> A: A sworn-yes, that's the definition under Blacks Law.

McCray Second Deposition p.9 Exhibit 7

What McCray has failed to disclose is that on October 2, 2012 four days before the fair debt notice letter was sent, McCray acknowledged receiving (McCray Deposition Exhibit 7 pgs 72-73) the Maryland State mandated NOI which delineated all the same information necessary for the verification. See Exhibit 8. By regulation, the NOI is registered with the Maryland Department of Labor, Licensing and Regulation (DLLR)(Exhibit 9). The NOI is in and of itself a verification of the debt. It verifies the arrearage and the identity of the servicer and investor.

Accordingly, the NOI served as debt verification pursuant to the FDCPA. Moreover, when considered  with the prior information received from Wells Fargo in 2011 and 2012, even a reasonably unsophisticated  consumer like McCray, could not contend that there was an actual debt dispute so that the verification claimed is immaterial. Indeed McCray never sought declaratory relief after the information of the debt was provided by Wells Fargo if the figures were indeed erroneous. Again McCray repeatedly admits she is in default  See McCray Notice Exhibit 22.

Long before the foreclosure action was instituted and the alleged FDCPA violations occurred, McCray claims that she sent two requests which she asserted were qualified written requests (QWR's) to Wells Fargo. The first was dated June 14, 2011 and the second was dated March 5, 2013. Second Amended Complaint, ¶¶ 70 & 79.  McCray Deposition Exhibit 10, p. 11, 42.5.

With respect to the June 14, 2011 letter, McCray alleged that it was delivered to Wells Fargo on June 20, 2011, she contended very interestingly that Wells Fargo did not timely respond to it. Second Amended Complaint, ¶¶ 72-73. With respect to the March 5, 2013 letter, McCray contends that Wells Fargo failed to provide a "point by point" response to her questions. Second Amended Complaint, ¶ 79.  Also see Memorandum Opinion (ECF 43 at p. 29).  This Court previously determined that McCray's September 14, 2011 "Notice of Default" did was not a QWR.  Order and Memorandum Opinion (ECF 43 & 44).

The June 14, 2011 McCray letter purported to be a QWR stated that McCray disputed the amount owed. However, in that letter McCray did not point to any specific error or state any reason that she believed the account was in error. Instead she demanded that Wells Fargo provide her with information concerning the loan history which they did. See June 14, 2011 Exhibit 11. McCray admitted in her deposition that she could not state why she needed or wanted the information for any particular purposes other than the fact she believes she was "entitled" to it. Specifically, the relevant portion of McCray's deposition testimony is as follows:

> Q.  Why did you need that information?
> A.  Because I wanted the information.
> Q.  But why did you need it?
> A.  Because I am entitled to it.
> Q.  Tell me why you needed it.
> A.  Because I'm entitled to it.
> Q.  So you just wanted it just because you wanted it?

> A. That's right.
> Q. Okay. And not because you needed it for any particular reason?
> A. Because I am entitled to it.
> Q. Did you need it for any particular reason?
> A. Because I am entitled.
> Q. Can you answer? I think that's a yes or no. Did you need it for any particular reason?
> A. Because I'm entitled to it.

.

McCray Deposition, Exhibit 10 pp. 54-55.

> Q. Okay. You don't recall why you sent the Qualified Written Request?
> A. I can't remember exactly.

McCray First Deposition, Exhibit 10 p. 58.

According to McCray, the June 14, 2011 letter was delivered. Second Amended Complaint, ¶72. Again the letter requested the very same information that McCray claimed she did not receive from the SIWPC Defendants in 2012.

McCray next mailed a "Certificate of Non-Response Notice of Default" on September 14, 2011 much like the letter sent to the SIWPC Defendants after her demand. See Exhibit 12. This Court previously ruled that this correspondence did not constitute a QWR. See Order and Memorandum Opinion (ECF 43 & 44). On October 10, 2011 Wells Fargo sent correspondence to McCray responding to her June 14, 2011 letter. Exhibit 13. Wells Fargo enclosed a detailed Customer Account Activity Statement (payment and transaction history) (Exhibit 14) detailing the activity of her loan, an escrow analysis for the two prior years, and a copy of the Note and Deed of Trust showing the balance due.

On October 25, 2011 Wells Fargo wrote in response to McCray informing her that the investor of her loan is Freddie Mac and it again enclosed a copy of the Note and Deed of Trust. Exhibit 15.

On November 5, 2011 McCray sent a letter to the Office of the Maryland Attorney General (Douglas F. Gansler) noting that in May of 2011 (prior to sending her June 2011 correspondence to Wells Fargo) she watched a 60 Minutes broadcast which made her "wonder" who owns her mortgage. Exhibit 16. She noted in this letter that watching the program caused her "to research the matter further," including sending the alleged June 14, 2011 letter. She acknowledged in this correspondence that on October 17, 2011 she received a response from

Wells Fargo to her letter; however, she complained that Wells Fargo did not "disclose the 'Holder' in possession of [her] promissory note." McCray acknowledged in her deposition that the ownership of her mortgage was her concern.

> Q. So that was your concern. As of early November 2011, your concern was who owned your mortgage; is that a fair statement?
> A. Yeah. I think that that is a fair statement now that it comes back to me.

McCray First Deposition, Exhibit 10 pp. 108-109.

On November 22, 2011 Wells Fargo sent correspondence to McCray again enclosing a copy of the Note, pointing out that it does not disburse original documents and stating that the investor is Freddie Mac. Exhibit 17. McCray's deposition testimony again demonstrates that her questions concerned the ownership of her loan.

> Q. All right. Now, having received this November 22nd 2011 letter, what information in your June 2011 Qualified Written Request had Wells Fargo not responded to in your opinion?
> A. They never responded if it has been assigned, sold or transferred. They sent a certified note, promissory note with no endorsements, and they're saying that in this letter after I sent them two additional letters that Freddie Mac is the investor. So my question is what is an investor?

McCray Deposition, Exhibit 10  p. 114.

On December 15, 2011 Wells Fargo sent McCray additional correspondence explaining its role as servicer and the role of Mortgage Electronic Registration System (MERS) with respect to recording of title. Exhibit 18.  This information was reiterated in correspondence to McCray dated January 10, 2012  Exhibit 19. When asked what information in her alleged QWR had not been provided, McCray testified that she was seeking information concerning the "assignment, sale or transfer" of her loan.

> Q. So as of December 15th when you received [the December 15, 2011 letter from Wells Fargo], what information do you contend that you still had not received that was in response to your Qualified Written Request?
> A. As I stated, I'm not in receipt of Wells Fargo ever being the legal owner of the promissory note. I'm not in receipt of Freddie Mac being the legal owner of the promissory note. You sent me back a promissory note with no endorsement. You never sent any assignment, sale or transfer, so that's what was in my QWR that you never responded to.

McCray Deposition, Exhibit 10  p. 123.

In correspondence dated February 6, 2012 McCray complained that she had asked for a "visual inspection of the original promissory note, not a copy" and demanded information about whether her loan "was securitized as required by law" as well as "a full accounting of the Chain of Custody for the said Promissory Note." Exhibit 20. It is perplexing that McCray in her Notice of Self Executing Conditional Acceptance (Exhibit 22) admits that she signed the  deed of trust (Exhibit 1) and the corresponding note  and is in default on the loan. She later takes a position that the signatures on those documents are not hers.

Later in 2012 McCray embarked upon a series of 'invalid debt elimination' schemes. In that case McCray enlisted help over the internet to issue a payoff check issued by Jameela Hagg as an Electronic Funds Transfers (EFT). Exhibit 21. Once again this acknowledges the debt due. In her deposition McCray admitted it was a scam thought later tried to rectify same with Wells Fargo.

> Q. Did you ask Mr. Jameela Hagg, H-A-G-G, to issue this check? [Deposition Exhibit 19].
> A. Yes I did…..

See McCray Deposition Exhibit 7 p.63-64.

By this time, McCray had received the October 2, 2012 statutory NOI (Exhibit 8) which is sent  to the borrower which contains all the information necessary to validate the debt  as is required by Real Property Article, §7-105.1(c), Annotated Code of Maryland.

The purpose of the NOI under the statute, is to provide some advance warning of the foreclosure proceedings to the defaulting borrower, the identification of the secured party, the arrearage and other specified information to allow the borrower to contact the servicer and secured party and pursue a modification of the loan or other action to forestall foreclosure. See *Shepherd v. Burson*, 427 Md. 541, 557, 50 A.3d 567 (2012) (quoting Maryland Homeownership Preservation Task Force Report, at 36 (November 29, 2007)) as cited in *Granados v. Nadel*, 220 Md. App. 482, 502, 104 A.3d 921, 933 (2014). Obviously, it was designed to do exactly what debt verification would

McCray admitted that she received the NOI

> Q: I'm just asking: Did you ever receive the notice of intent to foreclose?
> A: I have received the notice of intent to foreclose, yes.

McCray Deposition Exhibit 7 p, 73.

The NOI was duly filed with DLLR in October 5, 2012 (Exhibit 9) in compliance with the statute and a foreclosure action maybe instituted forty-five (45) days thereafter. In this case the foreclosure action was not docketed until February 12, 2013. Four (4) days after the NOI was sent to McCray, the Fair Debt Letter dated September 28, 2012, was sent to her from the White Law Firm (4th Amended Compl.¶ 9). McCray apparently ignoring the entire lender, investor and arrearage information previously provided by Wells Fargo and the White Law Firm, again renewed the same inquiry she had with Wells Fargo previously. McCray's dispute, besides requesting documentary proof of the default and proof of entitlement, was disputing the amount of the very debt Wells Fargo had just validated,  the identity of the  investor, and the owner of the debt , all of which had just been disclosed by Wells Fargo.  Even after receiving this information, McCray on March 5, 2013 sent Wells Fargo once again a "QWR" requesting the very information previously provided.

15 U.S.C. § 1692g(a)(4) merely requires that  any verification be mailed. (15 U.S.C. § 1692g(a)(4) "…the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment *will be mailed to the consumer* by the debt collector"(emphasis added)). While disputed by McCray, the White Law Firm asserted that it responded to the debt dispute on December 3, 2012 (Exhibit 5), asserting  that it mailed the response by <u>both</u> regular first class mail and by certified mail as testified by Daniel Pesachowitz the White Law Firm's designee:

Q I'm going to show you what was, previously, marked as Exhibit D [Exhibit 5 to this Motion]. Which is the FDCPA letter. Have you seen this letter?
A Yes.
Q Now you -- your testimony was that you were -- it was the firm's practice and procedure that this letter was sent out. Can you explain what the practice and procedure permits?
A Yes. A letter -- an FDCPA letter like this, our custom, and practice and procedure would be to -- before the letter -- when the letter was sent out, the Certified slip would be obtained. And the Return Receipt Requested number would be put on the letter -- on this letter, Exhibit D, the Certified numbers on there. And that would show that the letter was complete and sent out. If it didn't have the Return Receipt Requested number on it, that may indicate that the letter was in draft form only, and had not been sent. And that's our procedure, with respect to these letters
Q  And how long have you been with the firm?

A. Approximately, 15 years.

Q  And in those 15 years, has that been the practice and procedure of the firm?

A  At the time this letter was prepared, December 3, 2012, on or about that time, that was the procedure.

Q  And how do you know that this letter was sent?

A  Because it has the Return Receipt Requested number on the letter.

Daniel Pesachowitz deposition  Exhibit 23 September 18, 2018 pgs 100-101.

Once again the validation letter need only be sent by regular mail and the certified mail is optional. There is no record of either response being returned in this case. To counter that mailing occurred,  McCray responds to the mailing by contending that based upon the USPS, the USPS had no 'current' record of the 'certified mailing' when she checked on same. This hearsay letter does not negate the fact that the letter was 'mailed' by regular first class mail, it only means that there was no record maintained at the time McCray requested by the USPS of the certified mailing. Again the Mailbox Rule [10] in effect in Maryland which only requires it be 'mailed' not received and the only evidence, as advanced by Mr. Pesachowitz, is that the verification letter was mailed. McCray has produced  no contrary evidence to rebut that the mailing occurred  by regular mail and accordingly McCray's argument is without merit.

The foreclosure action docketed contains affidavits of ownership of the loan required by Maryland statutes which are part of the Order to Docket package were served upon McCray. Real Property Article, §7-105.1.

As noted above, McCray alleges that she sent Wells Fargo a second letter dated March 5, 2013. (Exhibit 24) In this correspondence, McCray claimed that "it has come to [her] attention that Wells Fargo Bank, N.A. was assigned" the deed of trust and she stated that she disputed "the legality of the assignment." Other than disputing the "legality of the assignment" McCray did not identify any errors or irregularities in the servicing of the loan.

McCray admitted in her deposition that the information she was still seeking concerned the assignments, sale or transfer of her loan despite the validations provided to her in 2011-12 by Wells Fargo.

---

[10] Griffin v. Bierman, 403 Md. 186, 201, 941 A.2d 475, 484 (2008)("The Maryland scheme assumes a worst case scenario, that the certified mail would be undeliverable, therefore first-class mail notice is necessary in conjunction with the certified mail, even if the certified mail is delivered successfully.").

Q. Yeah. But what did you need in March 5th of 2013 that you didn't already have?
A. The assignments, like it says, of the assignments, the sale, the transfer. I never got any of that information.

McCray Deposition, Exhibit 10 pp. 192-193.

It is undisputed that thereafter Wells Fargo timely responded to this correspondence on March 25, 2013. (Exhibit 25). In this response, Wells Fargo once again pointed out that it had previously provided the requested information and it provided an updated Customer Account Activity Statement and escrow analysis statements. In response McCray complains that Wells Fargo did not respond "point by point " similar to that asserted against these Defendant (4th Amended Compl. ¶ 58)

As the facts fully disclose, the debt being disputed had been verified and re-verified and validated long before the October 6, 2012 debt dispute arose. Indeed the necessary information concerning ownership of the loan, the actual key component of McCray's arguments as she admitted in her deposition, were fully verified repeatedly over a year before she made her demand and then again before the foreclosure action was even docketed when she received the NOI. Undeniably, there is nothing in the NOI when coupled with the prior information McCray received that would give just basis for McCray, even as a least sophisticated consumer, to find the language contradictory or inconsistent so as to leave her confused about her right to dispute the debt" or that the very information previously provided by Wells Fargo was in anyway wrong or otherwise false or deceptive. See *Garcia-Contreras v. Brock & Scott, PLLC*, 775 F. Supp. 2d 808, 818 (M.D.N.C. 2011). If nothing else, the NOI would have clarified and validated the prior information McCray received thus vitiating the need for there to be a debt dispute claim. What is rather perplexing is that is the fact that as McCray admitted in her deposition no one else besides Wells Fargo has made a demand for payment or been paid on this loan:

Q: Well let me ask you this, Ms. McCray: Since the beginning of this loan has a anybody besides Wells Fargo made a demand for payment?
A: Anyone since Wells Fargo made a demand for payment. I don't recall.
Q: Have you paid anybody else besides Wells Fargo?
A: No. I don't believe I have.

McCray Deposition Exhibit 7 p 43

The relevance here is, if there were competing demands for payment then there might be an actual debt dispute as to whom she owed, but she admits that there is none. Therefore, there is no basis for any aspect of the debt dispute as to who she is indebted to, and the provided accounting by Wells Fargo it is obvious that there really is no dispute as to the amount due. Consequently, as with her other foreclosure avoidance schemes in the past ( i.e. The EFT check Exhibit 21)  McCray is doing nothing more that seeking to use the FDCPA as an foreclosure avoidance scheme or as a means to delay the foreclosure of an undisputed payment default. In any event, even if the verification had not been provided by these defendants, the verification issues or lack thereof are not 'material'.

## 2.MATERIALITY REQUIREMENT IS NOT MET

Even if the Court were to determine that there is a question of fact as to whether the verification letter of December 3, 2012 (Exhibit 5) was sent or even required under the circumstances or was or was not appropriate, irrespective of all the pre-debt dispute information provided to McCray, the SIWPC Defendants contend that any alleged "false, deceptive, or misleading representation[s]" or "unfair or unconscionable means" employed, as proscribed by § 1692e-f, were not material violations  so as warrant a FDCPA action or that they were bona fide harmless errors. See 15 U.S.C. § 1692k(c). *Sayyed v. Wolpoff & Abramson, LLP*, 733 F. Supp. 2d 635, 647, 2010 WL 3313888 (D. Md. 2010) (a misrepresentation made by the debt collector solely as a result of inaccurate information provided by its client would be a bona fide error; *Smith v. Transworld Systems, Inc*., 953 F.2d 1025, 1032 (6th Cir.1992) (holding the defendant reasonably relied on its client's calculation of the debt owed, and that the resulting misrepresentation in a subsequent communication was a bona fide error ).

A FDCPA claim that involves a false representation, a complaint "must contain sufficient factual matter, accepted as true," that the alleged false representations were material. See *Stewart v. Bierman,* 859 F. Supp. 2d 754, 764, 2012 WL 1655716 (D. Md. 2012), aff'd sub nom. *Lembach v. Bierman*, 528 Fed. Appx. 297, 2013 WL 2501752 (4th Cir. 2013) citing  *Hahn v. Triumph P'ships*,. 557 F.3d 755 (7th Cir.2009)( the Seventh Circuit held that a false statement is not actionable under § 1692e unless it is material). The court found with regard to § 1692e-f that "[m]ateriality is an ordinary element of any federal claim based on a false or misleading

statement." Id. at 757 (citing *Carter v. United States*, 530 U.S. 255, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)); *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

Under § 1692e, if a representation would not mislead or deceive with respect to the debt, it is not actionable, even if it is technically false. See *Donohue v. Quick Collect, Inc*., 592 F.3d 1027, 1033–1034 (9th Cir.2010); *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 596–597 (6th Cir.2009); *Hahn v. Triumph Partnerships* LLC, 557 F.3d at 757–758. In other words, in order for a false statement to violate the FDCPA, it must affect a consumer's ability to make intelligent decisions with respect to the alleged debt. See *Donohue*, 592 F.3d at 1033–1034. This is an appropriate requirement not only because materiality is "an ordinary element of any federal claim based on a false or misleading statement," but also because the purpose of the FDCPA is to ensure consumers are able to make intelligent decisions and "by definition immaterial information neither contributes to that objective (if the statement is correct) nor undermines it (if the statement is incorrect)." *Hahn*, 557 F.3d at 757 as discussed in *Peen v Cumberland* 883 F. Supp. 2d 581,589 (2012).

A material false representation requirement has always been a prerequisite in the Fourth Circuit since 2012. See *Warren v. Sessoms & Rogers, P.A*., 676 F.3d 365, 374 (4th Cir.2012); See also *Stewart v. Bierman*, 859 F.Supp.2d at, 762–63 (applying materiality requirement). Indeed, this Circuit has explicitly recognized that "courts have generally held that violations grounded in 'false representations' must rest on material misrepresentations." *Warren* 676 F.3d at 374. In determining whether a false statement is material under the FDCPA, courts typically ask whether it would mislead or deceive the least sophisticated consumer with respect to the alleged debt. See *Donohue*, 592 F.3d at 1033; *Miller*, 561 F.3d at 596–596; *Hahn*, 557 F.3d at 757–758.

A key distinction between those cases and this matter, however, is that, here, McCray sought the very information in advance of the debt dispute from the servicer who supplied same to her with supporting documentation prior to her payment default  and before SIWPC Defendants sent their initial letter. McCray could not have been misled when the same information was supplied by the SIWPC Defendant in the initial letter and then in the NOI irrespective of the validation letter being sent. Even the fact that a statement is in a court document does not make it material per se, but rather one must look at the statement itself, in context, to determine whether it is material. See *Donohue,* 592 F.3d at 1033 (false statement in a complaint is immaterial); *Miller*, 561 F.3d at 596 (same); *Hahn*, 557 F.3d at 757–758 (same).

Here, McCray's allegations, however, do not involve a false representation (the trustees were properly named by the proper secured party as determined by this Court and the United States Bankruptcy Court), or any affirmative representation for that matter. Rather, as described above, McCray complains about conduct that involves a "failure to respond" and a "failure to disclose" assignment, transfer and the sale or the "legality of the assignment", was "from a debt collector." The statute does not this exact omission by requiring debt collectors to disclose the nature of the assignment, sale or transfer of a loan in any communication with a consumer. McCray does not contend that the assignment in anyway impacted her ability to make payments or that she does not know to which entity her payments are due, and thus, the question of which entity owns the Note is irrelevant to the resolution of the present case.  See *Deutsche Bank Nat. Tr. Co. v. Brock,* 430 Md. 714, 731, 63 A.3d 40, 50 (2013)(discussing this very issue). Indeed if McCray was confused as to pay irrespective of receiving the debt validation, she could have paid the payments into the Court Registry in the foreclosure action.

Accordingly nothing McCray alleges in anyway could have misled or was a misrepresentation as to who she owed or the amount then due or who the secured party was. Indeed the Courts determinations in both the Federal Actions and in the foreclosure action have now validated the very information provided and that the secured party had not only a right to foreclose but the right to appoint the substitute trustees.  Once more, the assignment transferring the loan from the original beneficiary to the Freddie Mac besides being recorded, the very same information was provided by the servicer to McCray, such that even if there was an error dealing with the disclosure of this information, that error is excluded from being sought against these Defendants under§1692k(c)   Accordingly the alleged FDCPA violations even if they existed were not material in nature.

## 3. THE STANDING AND DAMAGES ISSUE

Defendants also contend that McCray lacks standing to pursue her claims because she has failed to allege a cognizable injury-in-fact, as defined in the Supreme Court's decision in *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). Indeed, the Supreme Court reaffirmed that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S.Ct. at 1547 (citing *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). As the party invoking federal jurisdiction, McCray bears the burden of establishing those elements. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

In *Spokeo*, the Court reiterated that to satisfy the first element of the *Lujan* test, a plaintiff must establish that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). To be "particularized," an injury "'must affect the plaintiff in a personal and individual way,' " Spokeo, 136 S.Ct. at 1548 (citing *Lujan*, 504 U.S. at 560 n. 1, 112 S.Ct. 2130). A "concrete" injury, on the other hand, is one that is "'real,' and not 'abstract.' " *Spokeo*, 136 S.Ct. at 1548 (citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)).

Despite the allegation in the complaint, McCray in her depositions admitted that she sustained no damages from the alleged lack of verification. At her first deposition, McCray contended that she had not identified her damages because she was still compiling the information. McCray Deposition, Exhibit 10  p. 17, 21. McCray was quite clear that she has made no effort whatsoever to look for any receipts to document her damages or even state an estimate of the total damages that she contends she incurred with regard to any debt validation claim. McCray Deposition, Exhibit 10 pp. 30-31.

> Q. What evidence do you intend to submit to the court to substantiate your damage claims in this case?
> A. I'm still working on compiling them together.
>
> McCray Deposition,  Exhibit 10 p. 205.
>
> *     *     *
>
> Q. And so you've known since January what part of your case was still alive and what part the judge had dismissed, right?
> A. That's correct.
> Q. And the judge in this Order and Memorandum Opinion discussed the type of damages that you could try to claim in this case, correct?
> A. That's correct.
> Q. And you made no effort from January up until September to try to determine what your damages are in this case is that right?
> A. No, I was fighting you on appeals to get--to get all of my claims together, whereas I would be able to pursue every claim, so I was in appeals court.

McCray Deposition, Exhibit 10 pp. 37-38.

\*       \*       \*

Q.  Tell me the total amount of damages that you claim in this case?
A.  I don't know offhand.  I cannot give you an exact amount.
Q.  Okay. Give me an approximate amount.
A.  I can't give you an approximate amount.

McCray Deposition, Exhibit 10 p. 25.

Subsequent to her deposition, on November 13, 2014 McCray provided a document entitled "Plaintiff's Itemized List of Damages," Exhibit 25. Once again in her second deposition on August 2, 2018, McCray provided a document entitled "Plaintiff's Itemized List of Damages," Exhibit 30. However, rather than identifying any expenses allegedly incurred as a result of any failure to timely respond to a debt dispute, McCray lists in summary fashion all expenses she has incurred in connection with her legal activities disputing the authority of Wells Fargo to foreclose, including those incurred as part of her spurious debt elimination schemes such as her "Federal Postal Court Filing," "Mortgage Securitization" and the like. In fact in that deposition, McCray testified that any activities in her ongoing disputes and lawsuits with Wells Fargo are part of her claim.  Exhibit 10 p. 16-17. In her deposition as to the Amended Fourth Complaint, McCray admitted that she did not have any damages as to the verification claims. In her deposition McCray stated:

Q. Okay. Besides the filing of the document [speaking of the Deed of Substitution of Trustees] and the failure to verify, do you have any other damages?
A. My life.
Q. Okay.
A. My life, the emotional stress and everything that I have been through.
Q. That's the foreclosure --
A. That's the foreclosure. That's --
Q. -- that you've already established here.
A. That's the foreclosure. That's them violating the FVCPA [FDCPA].
Q. Right. So your damages are the foreclosure action that was --
A. The illegally filed foreclosure action.

McCray Deposition Exhibit 7 pp.91-92

In here subsequent deposition on August 2, 2018 McCray once again revalidated that her damages arise out of the foreclosure action and not the instant case when question about her list of damages (Exhibit 30)

> Q: Okay. All of these expenses on your itemized list of damages [Deposition Exhibit 27 which is Exhibit 30 hereto] are—arise for the foreclosure action; correct?
> A: That's correct.

MCray Deposition Exhibit 7 Pg 84

Regardless her damages are not actual or concrete. While McCray alleged that she has been damaged "[a]s a result of Defendant's improper debt collection practices" in violation of 15 U.S.C. §§ 1692e, 1692e(2), 1692e(8), 1692e(10), and 1692f, (4th Amended Compl.¶¶ 41-44) her testimony is that her damages arose as she testified to from , "…The illegal filed foreclosure action"… (McCray Deposition Exhibit 7 p 92).

According to McCray, she disputed a debt with the White Law Firm (though she contends it was all of the SIWPC Defendants despite sending only a single letter to the White Law Firm, 4th Amended Compl.¶11), but that the individual SIWPC Defendants failed to allegedly verify the disputed debt, and more generally a violation of 15 U.S.C. § 1692e (prohibiting broadly "any false, deceptive, or misleading representation" in the collection of a debt), § 1692e(2) (prohibiting the "false representation" of the "legal status of any debt"), § 1692e(10) (prohibiting the "use of any false representation or deceptive means to collect or attempt to collect any debt"), and § 1692f (prohibiting "unfair or unconscionable" debt collection). McCray merely asserts conclusory statements unsupported by any verifiable factual components.

McCray only sustained damages associated with the alleged "illegal filed foreclosure action" litigation and challenging the Deed of Substitution of Trustees (4th Amended Compl.¶ ¶33-35), Plaintiff does not further articulate any tangible actual harm that she has suffered directly arising from or traceable to the verification issue. Furthermore, McCray does not even appear to allege that she suffered an intangible injury by virtue of any technical procedural violation, if any, so as to even assert a claim for the $1,000.00 statutory damages.

The Act provides that "any debt collector who fails to comply with any provision of th[e] [FDCPA] with respect to any person is liable to such person." 15 U.S.C. § 1692k(a). This broad

language entitles any successful plaintiff to actual damages, costs, and a reasonable attorney's fee that is set by the court. Id. The court may also allow additional damages, subject to a $1,000 limit. Id. In considering whether to award additional damages, a court must consider "the frequency and persistence of [the debt collector's] noncompliance," "the nature of such noncompliance," and "the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b). Here McCray advances no argument nor do any evidence of any intentional, frequency or persistence of noncompliance behavior by the SIWPC Defendants, such that she is not entitled any statutory damages arising from the verification issues.

As is evident from the filings in the Foreclosure Action, McCray has repeated sought to stay or dismiss the foreclosure action which had been docketed in the Circuit Court. However, that Court denied the requested relief in each instance. McCray has also disputed Wells Fargo's standing, as holder of the note, to instruct the Substitute Trustees to institute the foreclosure action. However, the U.S. Bankruptcy Court found otherwise and granted the Motion to Lift Stay over McCray's objection after a full day evidentiary hearing in which the original note was produced (See Exhibit 4, Order). In addition, the U.S. Bankruptcy Court, in recommending dismissal of McCray's related adversary claim, found that Wells Fargo is the holder of the note and has authority to enforce the note and appoint the substitute trustees. (See Exhibit 4, Bankruptcy Court's Proposed Findings and Conclusions In Support of Dismissal of Amended Complaint.)

To date, McCray continues to contend that "missing" from Wells Fargo's and the SIWPC Defendants communications to her is information concerning the "assignment" and "securitization" of her mortgage loan. She has repeated asserted in this case which is contrary to the findings of other Courts, that Freddie Mac is not the secured party based upon this alleged securitization and that the SIWPC Defendants don't represent Freddie Mac in the foreclosure;

> Q. What is the missing link? What is the missing piece of information that you contend that you've never been told?
>
> A. Missing link is Wells Fargo claims to be was that they have received the promissory note, that they bought it from American Home Mortgage. I would like to see the assignment and what they paid for it. And also they claim that it went to Federal Home Loan Mortgage. I would like to see the assignment and what they paid for it, and I also had a securitization done and I want them to admit to the fact that it was securitized and the note has been converted into a security.
>
> McCray Deposition, Exhibit 10  pp. 201-202.

As the court noted in *In re Veal*, 450 B.R. 897, 909 (9th Cir. BAP 2011), "[u]nder established rules, the maker [of a note] should be indifferent as to who owns or has an interest in the note so long as it does not affect the maker's ability to make payments on the note." 450 B.R. at 912. *Accord Deutsche Bank Nat. Tr. Co. v. Brock,* 430 Md. at 731, 63 A.3d at 50.*infra.* McCray does not contend that the assignment in anyway impacted her ability to make payments or that she does not know to which entity her payments are due, and thus, the question of which entity owns the Note is irrelevant to the resolution of the present case. Id. *Deutsche Bank Nat. Tr. Co. v. Brock*, 430 Md. at 731, 63 A.3d at 50.

McCray has produced no competent evidence that she incurred any actual damage as a result of any alleged failure to timely respond to her alleged debt dispute.  Here, McCray cannot make such an evidentiary demonstration and even admitted that her statutory claims are traceable not out of the FDCPA verification issue of October 6, 2012 , but out of the "illegal foreclosure action" (and the Deed of Substitution of Trustee) which was not instituted until February 2013. See McCray Deposition Exhibit 7 pp.91-92 above. Even if the verification was not undertaken, as the SIWPC Defendants contend it was, McCray still admits that she sustained no concrete and particularized harm arising out of the alleged failure to verify the debt. Therefore, McCray has not sufficiently alleged nor proved that she has standing as mandated by *Spokeo*. Indeed McCray admits that her injury and damages arise out of the State foreclosure action alone.

## 4. COUNT II IS WITHOUT MERIT

McCray once more alleges in Count II of the Fourth Amended Complaint that the debt had not been verified  after her demand and by filing and pursuing the foreclosure action (§1692i), failing to obtain her prior consent to contact her in violation of §1692c(a); that the foreclosure action caused her embarrassment and humiliation which damaged her reputation in violation of §1692d(1); that advertising the foreclosure sale on the Auctioneers site and in the Daily Record  without McCray's authorization violated §1692c(b); and that proceeding with the illegal debt collection "dubbed a non-judicial foreclosure" was a  violation of §1692f(6). Here, McCray disregards the verifications provided and her execution of the loan documents.

First and foremost,  this Court adjudicated these very same issues in McCray II and found that there was no cause of action and granted these very Defendants  summary judgment.  See Opinion Exhibit 6 ECF 97.

Secondly as discussed above §1692g merely provides for a debt dispute to arise <u>upon the initial communication letter with the consumer</u>. 15 U.S.C. § 1692g(a)-(b). Once the demand letter has been sent there is no right to seek additional verifications. B*eler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473 (7th Cir.2007) (explaining that § 1692g(d) means that "legal pleadings no longer need be preceded or accompanied by verification notices") as cited in *Allen v. Bank of Am., N.A*., 11 C 9259, 2012 WL 5412654, at *4 (N.D. Ill. Nov. 6, 2012). Despite the verifications provided by Wells Fargo, the NOI provided, which revalidated the information  previously provided by Wells Fargo, and ostensibly the verification provide by the White Law Firm on December 6, 2012, McCray continued with a course of additional debt disputes between 2012 and the date of sale. As a courtesy to McCray, her debt disputes were re-verified in compliance with 15 U.S.C. § 1692g(a)-(b).

McCray made her secondary debt dispute on or about October 28, 2013 and same was responded to on or about November 12, 2013.  McCray then made additional demands debt disputes upon Wells Fargo and the White Law Firm April 22, 2017 which was verified on May 4, 2017. See Exhibit 28. Obviously this was long before the November 2017 foreclosure sale. Again the verification revalidated if nothing else the information provided to McCray in 2011 and 2012 by Wells Fargo and the White Law Firm. Clearly the allegations by McCray as to the failure to verify the debt prior to the foreclosure sale is without merit and factually erroneous.

 Additionally, McCray while disputing that she executed the promissory note which this Court, the United States Bankruptcy Court, the State Circuit and Appellate Courts have held enforceable. The Deed of Trust clearly denotes that McCray agreed and consent to state foreclosure procedures and process. See The Deed of Trust (Exhibit 1 ¶22)  This provision of the deed of trust provides that borrower waives demand upon her, that notice is advertised and that upon default (which McCray admitted to in her 2012 Notice, Exhibit 22) and acceleration McCray "in accordance with Title 14 Chapter 200 of the Maryland Rules of Procedure does hereby declare and assent to the passage of a decree to sell the Property…". Without dispute McCray was mailed the notice of default and acceleration, which she failed to cure, and therefore in accordance with Title 14 of the Maryland Rules of Procedure the Property was properly advertised and sold. The fact that the auctioneer had the property address listed on its web site is an additional manner of advertising. If any embarrassment or humiliation she alleged encountered, it was a direct result of her failure to pay on the loan causing the default.

Furthermore, as discussed above, McCray has raised this issue repeatedly in her motions to dismiss that she filed in the State Foreclosure Action as well as in the United States Bankruptcy Court. On each occurrence, the Circuit Court found the issue was without merit, and found that there was a right to foreclose. These decisions have now been affirmed by the Maryland Court of Special Appeals (See Exhibit 3). Similarly, the United States Bankruptcy Court made an analogous finding of fact and recommendations which were adopted by the District Court and then later affirmed by the Fourth Circuit Court of Appeals. See Exhibit 4. As such, res judicata and the law of the case doctrine clearly vitiate her argument

Accordingly this must Court grant judgment for the Defendants as Count II is without merit is without merit and that they are entitled to judgment as a matter of law.

## 5. THE CLAIMS ARE BARRED BY RES JUDICATA

As discussed above, this Court in McCray II, dismissed substantially all of the same issues  McCray has raised here in her Fourth Amended Complaint in its Order of this Court in its March 31, 2017 Order  (ECF 97) in McCray II  (case no GLR-16-934)  on same issues granted a partial summary judgment to the SIWPC Defendants as to McCray's claims under 15 U.S.C. §§ 1692c(a), c(b), c(c), e(2)(A), f(6)(A), and j(a), but denied the motion as to McCray's claim under 15 U.S.C. § 1692g(b) without prejudice.

"Under the doctrine of res judicata 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.' " *Andrews v. Daw*, 201 F.3d 521, 524 (4th Cir.2000) (quoting *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). "To establish a res judicata defense, a party must establish: (1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Jones v. SEC,* 115 F.3d 1173, 1178 (4th Cir.1997) (internal quotation marks omitted). Res judicata not only "bar[s] claims that were raised and fully litigated," but also " 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.' " *Peugeot Motors v. E. Auto Distrib*., 892 F.2d 355, 359 (4th Cir.1989) (quoting *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)). "Res judicata . . . bars a party from relitigating a claim that was decided or could have been decided in an original suit." *Laurel Sand & Gravel Co. v. Wilson*, 519 F.3d 156, 161 (4th

Cir. 2008) (citing *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004)). Indeed many of the very arguments advanced by McCray have now been adjudicated in the State Court foreclosure as delineated in the COSA opinion . See Exhibit 3. When a federal court litigant asserts res judicata based on a state court judgment, "[the] federal court must give to [the] state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. at 81. The Maryland analysis of res judicata mirrors that of the federal courts. See *Capel v. Countrywide Home Loans, Inc.*, No. WDQ-09-2374, 2010 WL 457534, at *3 (D. Md. Feb. 3, 2010) (*citing Anne Arundel County Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037 (Md. 2005))

All aspects of res judicata apply relative to McCray's prior case (McCray II) as well as issues finding that the secured parties and the substitute trustees had the right to foreclose upon McCray as determined by the state appellate court. The parties are the same and the claims presented are identical. As the prior case which was thereafter consolidated into this matter, resulted in a dismissal based upon the merits, was determined to be sufficiently firm to be accorded conclusive effect,' based on factors such as whether the parties were heard in the issue and whether the decision was appealable." *Graves v. OneWest Bank, FSB,* No. PWG-14-1995, 2015 WL 2452418, at *5 (D. Md. May 20, 2015) (quoting *Morgan v. Morgan*, 68 Md. App. 85, 92 (Md. Ct. Spec. App. 1986) (quoting Rest. 2d (Judgments) § 13 (emphasis in Morgan))). Therefore, it is clear that the claim preclusion aspect of the doctrine applies which dismissed all but the verification issue on 15 U.S.C. § 1692g discussed above.

Here, as in McCray II, as to the §1692c claims (communications in connection with debt collection)there is no evidence that any of the Defendants ever communicated with McCray in any of the forms of communication delineated by §1692c(a). Indeed the deed of trust and note as discussed above provide that McCray agreed and consent to the communications she contests with the third parties . More perplexing is that McCray argues that she demanded that these Defendants cease and desist selling her home or communicating with her, but she repeated demanded that these Defendants communicate with her as indicated in her demand for validation of her debt.

Likewise as to §1692e claims (proscribing false, deceptive or misleading representation in connection with a collection of a debt) , as Judge Russel found the assertions as to the advertisement "belies the undisputed language of the advertisement which does not mention her

name or that she owes a debt"   . McCray's claim that the illegal foreclosure was improperly docketed in Baltimore City Circuit Court violated §1692e(5) (Compl. ¶29) has also been found by COSA and this Court to lack merit as the right to foreclose has be validated. Thus under the *Younger v Harris*   401 U.S. 37 (1971), this Court must abstain from interfering in that state proceeding which is what McCray is attempting this Curt to determine- the validity of the foreclosure action. As this Court found in McCray II all the elements of the Younger test were satisfied  so McCray's §1692e(5) and (2)(A) claims must be dismissed.

Similarly, McCray's . §1692i(a)(1) claim  about bring the foreclosure action in Baltimore City Circuit Court  (or as she describes, "the foreign state tribunal is not a judicial district" Compl. ¶30)) is nothing more than a misconstruction of the statute which has now been validated by COSA, the United States Bankruptcy Court and this Court .

McCray goes on to assert in both Counts §1692f claims – employing unfair  or unconscionable means to collect or attempt to collect a debt. .Here McCray asserts that Defendants never had the right to seek the very enforcement that they were retained to pursue by Wells Fargo. Once again, the Younger Doctrine comes into pay which would preclude this Court from resolving this issue. Obviously now that COSA has adjudicated this issue and McCray's certiorari petition to the Court of Appeals has been denied  this issue, the right to foreclose is now law of the case  and precluded.

McCray's §1692j(a) and (b) concerning deceptive forms  to appoint the substitute trustees and to unset hos powers to dispossess McCray of her property. Once again Courts of competent jurisdiction have all found that Wells Fargo had the right to foreclose and the Bankruptcy Court even lifted McCray's Stay to do so. Clearly res judicata precludes the claims as does *Younger*.

Once again, Judge Russell's March 3, 2017 Opinion ( Exhibit 6 ECF 97) very clearly adjudicated the very actions that McCray  has alleged and precludes all claims besides her §1692g claim  which is fully addressed above.

 Accordingly, summary judgment as to all matters must be granted.


## E. CONCLUSION

McCray's arguments regarding the debt dispute is without merit. Even if there was a dispute as to the White Law Firms verification of the debt on December 3, 2012, it is clear that

the verification would have been superfluous at best and was not a material violation regardless.

Indeed McCray has not sustained any damages arising out of the alleged FDCPA claims.

Accordingly, for the reasons more fully recited above, the SIWPC Defendants move for summary judgement as there is no genuine dispute of any material fact.

Respectfully Submitted:
Samuel I. White, PC
/s/ Robert H. Hillman
Robert H. Hillman, MD 06910
611 Rockville Pike #100
Rockville, MD 20852
        301-804-3385
        Fax 301-838-1954
rhilllman@siwpc.com
Attorney for Samuel I White
P.C. and the SIWPC Individuals

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 14, 2019  I filed via CM/ECF and served  by first class mail, postage prepaid, a copy of the foregoing to: Renee L. McCray, 109 North Edgewood Street, Baltimore, MD 21229, Plaintiff;

/s/ Robert H. Hillman
Robert H. Hillman